## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**ALI EL-HALLANI, et al**,

          Plaintiffs,

                                        No. 13-cv-12983

vs.                                Hon. Gerald E. Rosen

**HUNTINGTON NATIONAL BANK**,

          Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S
## MOTION TO DISMISS

### I. INTRODUCTION

On October 14, 2013, Plaintiffs Ali El-Hallani and Mark Manuaeel filed their three-count Amended Class Action Complaint (Amended Complaint) against Defendant Huntington National Bank.[1]  Plaintiffs generally allege that Defendant closed their respective bank accounts due to their race, ethnicity, and/or religious affiliation in violation of 42 U.S.C. §§ 1981, 1982, and Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2201 *et seq.*  They bring this purported class action on behalf of Defendant's past, present, and future customers.  Defendant has now

---

[1] Plaintiffs initiated this action on July 11, 2013.  (Plfs' Compl., Dkt. #1).  In response to Defendant's Motion to Dismiss (Def's Mtn., Dkt. #5), Plaintiffs amended their Complaint as a matter of course pursuant to Federal Rule of Civil Procedure 15(a)(1).

moved to dismiss Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Having reviewed and considered Defendant's Motion and supporting brief, Plaintiffs' response thereto, and the entire record of this matter, the Court has determined that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Therefore, the Court will decide this matter "on the briefs." See Eastern District of Michigan Local Rule 7.1(f)(2). The Court's Opinion and Order is set forth below.

## II. PERTINENT FACTS

### A.    Plaintiffs' Amended Complaint

Plaintiffs describe themselves as either "Arab American," "of Middle Eastern origin," and/or "Muslim," or individuals who are perceived by others -- including Defendant -- as such. (Plfs' Am. Compl., Dkt. # 12, at ¶¶ 18-21, 29, 38-39, 52-53, 69-70). They formerly banked with Defendant until March 2013, when Defendant "unilaterally closed" their accounts "without providing . . . any reason for doing so." (*Id.* at ¶¶ 17, 24-27). Plaintiffs did not engage in any "illegal activity involving their accounts" with Defendant. (*Id.* at ¶ 28). According to Plaintiffs, Defendant subjects its Arab, Middle Eastern, and/or Muslim customers (or those perceived as such) to a "greater scrutiny than non-Arab, non-Muslim and non-Middle Eastern customers" because they "must overcome a suspicion that they

are attempting to aid in terrorist activity or are conducting fraudulent activity." (*Id.* at ¶¶ 33, 43, 57, 74). Closing Plaintiffs' accounts "demonstrate[s]" this greater scrutiny. (*Id.*).

On Plaintiffs' "information and belief," Defendant's headquarters sends individual bank branches a list of business names once a quarter of accounts to be closed. (*Id.* at ¶¶ 30-31, 40-41, 54-55, 71-72). Defendant bases these lists on their customers' race, ethnicity, and/or religious affiliation. (*Id.*). This practice has "resulted in hundreds of business and individual accounts being closed in a short period of time," and disproportionately affects Arabs, Middle Easterners and/or Muslims. (*Id.* at ¶¶ 31, 32, 41, 42, 55, 56, 72, 73). Though Plaintiffs generally allege that "non-Arab[], non-Muslim and non-Middle Eastern customers who have account histories similar to Plaintiffs [did] not have their accounts closed," (*Id.* at ¶¶ 35, 45, 59, 76), they do not identify any such similarly situated individuals whom Defendant treated differently. Rather, they bolster this allegation with the assertion that "[s]ince the filing of this lawsuit and receiving local press," only Arab, Middle Eastern, and/or Muslim former customers "have come forward with . . . similar complaint[s]." (*Id.* at ¶¶ 35, 45, 59, 76).

In sum, Plaintiffs "believe" that Defendant closed their bank accounts "because Plaintiffs are Arab, Muslim, and Middle Eastern, or perceived as Arab, Muslim, or Middle Eastern." (*Id.* at ¶¶ 34, 44, 58, 75; *see also id.* at ¶¶ 46, 60, 77-

79).   Plaintiffs also claim that Defendant "failed to conduct its business in a fair and equal manner which prejudiced the Plaintiffs" and "deviated from business norms in such a manner to support an inference of discrimination."   (*Id.* at ¶¶ 48, 64, 78-79).

**B.     Materials Attached to Plaintiffs' Response**

In Response to Defendant's Motion to Dismiss, Plaintiffs attached three affidavits that are outside their Amended Complaint.   Though a Rule 12(b)(6) motion focuses primarily on the allegations contained in the complaint, *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001), the Sixth Circuit has taken a "liberal view" of what materials are considered part of the pleadings for purposes of evaluating such motions.   *Armengau v. Cline,* 7 F. App'x. 336, 344 (6th Cir. 2001).   When affidavits do "nothing more than verify the complaint, and when they add[] nothing new, but, in effect, reiterate[] the contents of the complaint itself, they are not truly materials . . . outside the pleadings." *Yeary v. Goodwill Indus.–Knoxville, Inc.,* 107 F.3d 443, 445 (6th Cir.1997) (quoting *Song v. City of Elyria,* 985 F.2d 840, 842 (6th Cir.1993) (alterations in the original and internal quotations omitted).   Stated differently, affidavits that "simply fill[] in the contours and details of the plaintiff's complaint," may be considered by the court without converting a Rule 12(b)(6) motion to one for summary judgment.   *Id.*   Upon review of these affidavits, the Court will consider them without converting

4

Defendant's Motion to one for summary judgment because the affidavits just fill in more details without providing anything truly new.

The first affidavit, that of Samia Sareini, provides details concerning complaints the Arab American Civil Rights League (ACRL) has received regarding "account closures from several local banks, including Huntington National Bank."  (Ex. B to Plfs' Resp., Dkt. # 17-3, at ¶ 6).  Sareini is ACRL's Field Director and attests to the following pertinent facts:

- "On March 19, 2013, amid many complaints from the Arab community, the ACRL held a press conference and set up a hotline for individuals to call to complain about the closing of their bank accounts;"
- "The hotline was open to the public, regardless of race, national origin or religion;"
- "The ACRL received hundreds of phone calls and still receives calls on a weekly basis.  These individuals complained of account closures from several local banks, including Huntington National Bank;"
- "The individuals that I spoke with were Arab and/or have a Middle Eastern background;"
- "Currently, the ACRL has identified 25 individuals who had held accounts with Huntington National Bank alone that are Arab, Middle Eastern and/or Muslim.  All 25 individuals had their Huntington accounts closed;" and
- "I have not received any calls from people outside of the Arab American and Middle Eastern community."

(*Id.* at ¶¶ 3-6, 8-10).

The second affidavit, by Hussein Dabaja, provides information relative to his experience as a former employee at Defendant's Oakman branch in Dearborn,

5

Michigan.  (Ex. C to Plfs' Resp., Dkt. # 17-4).  Dabaja worked as a personal

banking representative from 2003 to 2009 and provides the following pertinent

facts:

- "The Oakman branch was a very profitable branch, largely due to Middle Eastern businesses in that area;"
- "I left employment in 2009.  I felt too much pressure from senior management and felt that the bank was discriminating against Arab and Chaldean business owners;"
- "The problem began in early 2008.  The bank began closing many accounts belonging to Arab Americans;"
- "Headquarters sent a list via email with initially approximately 30 business names [of] Arab and Chaldean accounts in early 2008.  They continued sending these lists every quarter (three months), varying in number, with the names of Arab and Chaldean businesses;"
- "It was obvious that these accounts were associated with Arab and Chaldean businesses, given the names on the accounts;"
- "When the bank closes the business account, in almost every occasion the bank would also close the accounts of the family members associated with that account;"
- "I personally witnessed over 200 business accounts that were closed in the short period of 2008 to September 2009 when I left employment at the bank;"
- "At times, local managers would try to convince headquarters that certain accounts should not be closed.  The local managers had good relationships with their customers;"
- "Headquarters, together with the Anti-Money Laundering Department of the Bank, made the decision of who to put on these lists, and these people were Middle Eastern, given the names associated with the accounts;"
- "Given the nature of many of the Arab American business owners, particularly those who own and operate gas stations and check cashing companies, some of these business owners dealt with large sums of cash.  However, after several deposits over the course of a long period of time, such deposits if they were previously

6

considered suspicious, should no longer (sic) considered suspicious;"

- "Huntington, I believe based on my personal experience and knowledge within the bank, is responsible for notifying other financial institutions that they had closed accounts with its customers. Those other financial institutions subsequently closed accounts already held with Huntington customers, or in some cases, closed newly opened accounts when prior customers sought their banking needs elsewhere;" and
- "The branch had many non-Middle Eastern bank account holders that were similar in many respects, only differing by Arab, Middle Eastern or Muslim characteristics, which were not closed during this period."

(*Id.* at ¶¶ 3-15).

The final affidavit is that of co-Plaintiff Mark Manuaeel.  (Ex. D to Plfs' Resp., Dkt. # 17-5).  He provides the following additional pertinent facts:

- "I received a notification letter [from Defendant stating that] . . . it would close my account on March 4, 2013;"
- "The letter stated that Huntington reserves the right to close its account at any time;"
- "Right after I opened the letter . . . , I went to the Huntington bank branch located at 37600 West 12 mile road (sic), Farmington Hills, Michigan to close my account;"
- "When I spoke with the banker at the branch, she asked me why I was closing my account.  I showed her the letter and she seemed surprised.  She said that it was strange that the letter had not been signed and offered to call someone to figure out what was going on.  When she returned, she told me that they had no information about the regulations on the account and that I could call a number that was given to her during the phone conversation;"
- "I asked the banker to close my account and she gave me a cashier's check;"
- "However, that number was the same number that was given on the notification letter itself;"

- "I called the number later on that day and no one answered my call.  The recording instructed that I leave a message.  I never received any explanation for why my account with Huntington was closed;"
- "I have never been convicted of any crime involving fraud or dishonesty;" and
- "I have never used the above account for any illegal purpose, nor have I transferred money from the account overseas."

(*Id.* at ¶¶ 5-13).

## C.    Plaintiffs' Claims

Plaintiffs assert three causes of action.  Counts I and II allege violations of 42 U.S.C. §§ 1981 and 1982, respectively.  Plaintiffs' Count III alleges a violation of Michigan's Elliott-Larsen Civil Rights Act (ELCRA), M.C.L. § 37.2201.  In lieu of filing an answer, Defendant moved to dismiss Plaintiffs' Amended Complaint.  (Def's Mtn., Dkt. # 14).  Defendant maintains that Plaintiffs' Amended Complaint falls short of Rule 8(a)'s pleading requirements in the aftermath of *Twombly* and *Iqbal*.  As set forth in more detail below, the Court agrees and therefore GRANTS Defendant's Motion to Dismiss.

## III. DISCUSSION

## A.    Standard of Review

In deciding a motion brought under Rule 12(b)(6), the Court must construe the complaint in the light most favorable to Plaintiffs and accept all well-pled factual allegations as true.  *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007).  To withstand a motion to dismiss, however, a

complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The factual allegations in the complaint, accepted as true, "must be enough to raise a right to relief above the speculative level," and must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for defendant's conduct." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013).

The Sixth Circuit has emphasized that the "combined effect of *Twombly* and *Iqbal* [is to] require [a] plaintiff to have a greater knowledge . . . of factual details in order to draft a 'plausible complaint.'" *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) (citation omitted). Put another way, complaints must contain "plausible statements as to when, where, in what or by whom," *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 373 (6th Cir. 2011), in order to avoid merely pleading an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

**B.     Plaintiffs' Amended Complaint Does Not State a Claim for Relief**

Plaintiffs' Counts I and II allege violations of 42 U.S.C. §§ 1981 and 1982. Originally codified as Section 1 of the Civil Rights Act of 1866, 14 Stat. 27, Sections 1981 and 1982 prohibit race discrimination with respect to contractual and property rights.   Both statutes require the intent to discriminate; that is, a plaintiff must allege intentional race discrimination in order to state claims under Sections 1981 and 1982.   *Moniz v. Cox*, 512 F. App'x 495, 500 (6th Cir. 2013) (collecting cases); *see also Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982); *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987).   Plaintiffs' Count III alleges that Defendant violated Michigan's Elliott-Larsen Civil Rights Act, which prohibits the denial of "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status."   M.C.L. § 37.2302(a).   A plaintiff may prove such a claim by presenting either direct or circumstantial evidence.   *Hazel v. Ford Motor Co.*, 464 Mich. 456, 462 (2001).

The question presented by Defendant's Motion -- whether Plaintiffs have put forth sufficient facts to support an inference of discrimination -- does not merit separate review of Plaintiffs' claims.   *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("We review claims of alleged race discrimination brought under §

10

1981 and the Elliott–Larsen Act under the same standards as claims of race discrimination brought under Title VII of the Civil Rights Act of 1964."); *Aboubaker v. Cnty. of Washtenaw*, 2013 WL 5313197, at *7 (E.D. Mich. Sept. 20, 2013) (Hood, J.) ("Courts have held that the . . . standards in analyzing discrimination claims under 42 U.S.C. § 1981, Title VII and ELCRA are the same."); *Reeves v. Rose*, 108 F. Supp. 2d 720, 725 (E.D. Mich. 2000) (Cohn, J.) (noting the same standards of proof under the Fair Housing Act, Sections 1981 and 1982, and ELCRA); *see also Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996) ("Because of their common origin and purpose, § 1981 and § 1982 are generally construed in tandem.").[2]   As set forth below, the Court finds that Plaintiffs have not alleged sufficient facts under *Twombly/Iqbal's* "plausibility" standard.

---

[2] Plaintiffs and Defendant both cite cases concerning establishing a *prima facie* case of discrimination under ELCRA.  Both the Supreme Court and the Sixth Circuit have made clear that a complaint need not satisfy this test and rather must only satisfy *Twombly/Iqbal*'s plausibility standard.  *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012) (requiring that a "complaint establish a prima facie case . . . is contrary to Supreme Court and Sixth Circuit precedent").  Stated again, Plaintiffs' *only* burden at this stage is to allege facts that plausibly support an inference of discrimination -- to set forth "sufficient 'factual content' from which [this] court . . . could 'draw the reasonable inference'" that Defendant closed Plaintiffs' bank accounts due to their race.  *Id.* at 610 (citation omitted).  This "plausibility" threshold "occupies that wide space between 'possibility' and 'probability.'  If a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied."  *Id.*

### 1.     Plaintiffs' Claims of Religious Discrimination

Though Defendant did not address the issue, the Court first finds that to the extent Plaintiffs seek relief on the basis of their religious affiliation, such claims are without merit.  "There is a distinction between being discriminated against on the basis of practicing a religion and being discriminated on the basis of being part of a racial group associated with a religion." *Abdulsalaam v. Franklin Cnty. Bd. of Comm'rs*, 637 F. Supp. 2d 561, 576 (S.D. Ohio 2009).  Of Plaintiffs' causes of action, only ELCRA contains a prohibition against religious discrimination.  *See* M.C.L. § 37.2302(a).  It is well-established that Sections 1981 and 1982 do not proscribe religious discrimination.  *See, e.g., Saint Francis Coll.*, 481 U.S. 604 at 613; *Jones v. Mayer Co.*, 392 U.S. 409, 413 (1968).  Here, Plaintiffs have not advanced *any facts* sufficient for this Court to discern that Defendant intentionally treated them differently "on the basis of being part of a racial group associated with a religion" that are independent from their claim of discrimination on account of their status as "Arab" and/or "Middle Eastern."  Accordingly, Plaintiffs have failed to state claims for discrimination under Section 1981, Section 1982, and ELCRA on account of being (or perceived as being) Muslim.

### 2.     Plaintiffs' Claims of Race Discrimination

As to Plaintiffs' claims that Defendant discriminated against them on the basis of being (or perceived as being) "Arab" and/or "Middle Eastern," all they

have done is to infer a "mere possibility of misconduct" on behalf of Defendant. *Iqbal*, 556 U.S. at 679. This, however, is not enough to "show" that they have stated a claim for relief. *Id.* Instead, Plaintiffs must put forth sufficient "factual content" to allow this Court to draw the reasonable inference -- based upon judicial experience and common sense -- that Defendant plausibly discriminated against Plaintiffs with respect to their race. *Keys*, 684 F.3d at 610 (citing *Iqbal*); *16630 Southfield Ltd. P'ship*, 727 F.3d at 504.

The Sixth Circuit's recent decision in *16630 Southfield Limited Partnership* illustrates this established pleading principle. In that case, the plaintiffs claimed that Flagstar Bank violated the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*, by discriminating against them on account of their national origin (Iraqi) when it refused to refinance their loan obligations without explanation. 727 F.3d at 503. In support, the plaintiffs set forth several allegations "upon information and belief" regarding Flagstar's more favorable treatment of non-Iraqis:

- "Flagstar has refinanced delinquent borrowers who 'were Caucasian' or 'not . . . members of minority groups;'"
- "Flagstar has made loans 'to persons not of Iraqi origin or business entities not associated with persons of Iraqi origin where the debt to equity ratio is significantly less than what [Plaintiffs] ha[d] without the additional collateral proposed;'" and
- "Flagstar has refinanced 'non-Iraqi' borrowers 'where the debt to equity ratio is significantly less than exists regarding Plaintiffs.'"

*Id.* at 506. The district court concluded that such allegations were not enough under *Twombly/Iqbal* to state a claim for relief and the Sixth Circuit agreed:

13

These are precisely the kinds of conclusory allegations that *Iqbal* and *Twombly* condemned and thus told us to ignore when evaluating a complaint's sufficiency. No doubt disparate treatment of similarly situated people may support an inference of discrimination. *But the plaintiffs have not identified any similarly situated individuals whom Flagstar treated better. They have merely alleged their "belief" that such people exist. These "naked assertions devoid of further factual enhancement" contribute nothing to the sufficiency of the complaint.*

*Id.* (citations omitted and emphasis added).

In addition to *16630 Southfield Limited Partnership*, other courts have dismissed similarly deficient complaints generically alleging that a bank closed an account on the basis of race. In *Mekuria v. Bank of America*, for example, the plaintiff alleged that Bank of America closed his bank account due to his race in violation of Section 1981. 883 F. Supp. 2d 10 (D.D.C. 2011). For support, the *Mekuria* plaintiff alleged, as pertinent here:

- "Upon information and belief, the summary closing and refusal to timely release funds entrusted to BOA was the result of unlawful profiling by BOA because of Mekuria's national origin, race and color;" and

- "Because of the facially baseless reasons for reversing the June deposits, defendant's sudden closing of all five of his accounts, its refusal to provide him access to any of his own funds, its failure to provide Mr. Mekuria with any explanation, coupled with the fact that Mr. Mekuria had recently been at the bank protesting defendant's treatment of him, and its referral to 'risk identification,' Mr. Mekuria was targeted for 'suspicious activity' solely because of his race and nationality."

*Id.* at 15. Finding that such allegations did not satisfy *Twombly/Iqbal*, the *Mekuria* court summed up the Plaintiff's allegations as "boil[ing] down to an argument that

because he was mistreated and because he is black, there must be some connection between the two." *Id.* "Such supposition," found the court, "is not enough;" the plaintiff just did not put forth any facts to suggest that Bank of America, or any of its employees, discriminated against him on the basis of his race. *Id.* For example, he did not "allege[] that any of the tellers at the Bank made any negative comments to him or treated him in a hostile or inappropriate manner while he attempted to make his deposits or while he challenged the Bank's decision not to credit the disputed funds to his account." *Id.* He also failed to put forth "any facts to suggest that white customers of the Bank are treated any differently." *Id.*

More recently, Judge Hood of this District examined a Section 1981 race discrimination claim brought by a "humanitarian and charitable organization . . . operated and controlled by Arab-Americans of Iraqi descent." *Life for Relief & Development v. Charter One Bank, N.A.*, 2013 WL 3810255, at *1 (E.D. Mich. July 23, 2013) (Hood, J.). In *Life for Relief*, the plaintiff opened several checking accounts with Charter One, which Charter One closed several months later. *Id.* Other banks followed suit thereafter. *Id.* A review of the *Life for Relief* complaint indicates that it proffered other "facts" similar to those presented in this instant matter:

- "Charter One did not give any reason for the closure of these accounts;"

15

- "Upon information and belief, if Plaintiff was not operated by persons of Arabic origin, Defendants would not have engaged in such conduct;"
- "Upon information and belief, Defendants have treated Plaintiffs differently because it is operated by Arab-Americans, or persons of Arabic ethnicity;"
- "Upon information and belief, Defendants have intentionally discriminated against Plaintiff based on Plaintiff's Arabic ethnicity, and their relationship or ties with primarily Arab countries, where Plaintiff operated by marking them as high risk, or undesirable, based on their ethnic make up;"
- "Had the officers of Plaintiff not been of Arab ethnicity, upon information and belief, the bank accounts would still be open;"
- "Had the officers of Plaintiff not been Arab-Americans and persons of Arab origin, upon information and belief, the bank accounts would still be open;"
- "Had Plaintiff operated in non-Arab countries, which Defendants had not 'redlined,' upon information and belief, the bank accounts would still be open;"
- "Upon information and belief, Plaintiff has been treated differently than similarly situated individuals based on its Arabic identity and ethnicity;" and
- "Defendants had no legitimate business interest for closing Plaintiff's accounts."

(12-cv-13550, Plfs' 2d. Am. Compl., Dkt. # 17, at ¶¶ 29, 32, 33, 43, 45-49).

Judge Hood found that such allegations did not plausibly state a claim for

Section 1981 race discrimination, reasoning as follows:

> Plaintiff simply alleges that it opened several accounts with Charter One, that Charter One closed these accounts based on its contractual right to close the account at any time, and that Plaintiff believes that this decision was based on race.  Charter One's notice of closure does not provide any reason for the account closures.  Plaintiff asserts without any factual basis that Charter One closed the accounts on the basis of race.  It does not provide any facts showing why it came to this conclusion or why the Court could reasonably infer that the

16

accounts were closed on the basis of race. Plaintiff does not even allege that Charter One was aware that Plaintiff was operated and controlled by those of Arab ethnicity and descent. Based on the facts alleged in the complaint -- Plaintiff opened an account that Charter One subsequently closed -- the Court cannot reasonably infer that Charter One is guilty of the alleged wrongdoing.

Plaintiff alleges that there is a pattern of discrimination because several other banks have also closed their accounts with Plaintiff. However, this is a leap that the Court cannot make. Without factual support, Plaintiff asks that the Court impute the alleged misdeeds of one bank to Charter One. The complaint does not give sufficient factual support for the Court to deem that Charter One's conduct was inappropriate. Without any factual support, the Court will not hold Charter One responsible for what may or may not have been a wrongful conduct on the part of another bank.

*Life for Relief*, 2013 WL 3810255 at *2. *Cf Khudhir v. JP Morgan Chase Bank*, 2014 WL 294304, at *4 (E.D. Mich. Jan. 27, 2014) (Drain, J.) (granting summary judgment on claim that Chase closed the plaintiff's account on the basis of race) (*citing Life for Relief*, *supra*).

As with the above cited cases, Plaintiffs anchor their claims in their *belief* that race motivated Defendant's decision to close their accounts. (Plfs' Am. Compl., Dkt. # 12, at ¶¶ 30, 31, 34, 40, 41, 44, 54, 55, 58, 71, 72, 75, 77). Plaintiffs' mere belief that Defendant discriminated against them, however, is insufficient to survive a Rule 12(b)(6) motion because a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *16630 Southfield Ltd. P'ship*, 727 F.3d at 506 ("plaintiffs have not identified any similarly situated individuals

whom [Defendant] treated better" and just "allege[] their 'belief' that such people exist.").

After setting aside these "beliefs," Plaintiffs' allegations boil down to the following facts: (1) They banked with Defendant; (2) Defendant's headquarters circulated quarterly lists of which accounts to close; (3) "Arab" and/or "Middle Eastern" accounts were on this list; (4) Defendant closed these accounts without explanation; (5) Defendant did not close similar accounts for non-Arab and/or non-Middle Eastern bank account holders; and (6) Only those similar to Plaintiff -- totaling at least 25 -- have complained to an Arab American Civil Rights organization about similar experiences with Defendant and other banks.  These assertions, however, do not plausibly lead to an inference of race discrimination. Plaintiffs have put forth no facts indicating, for example, that Defendant closed similarly situated accounts of non-Arabs, that Defendant compiled the closure lists with the intent of discriminating against Plaintiffs, or that Defendant's employees made statements to Plaintiffs reflecting a discriminatory bias towards Arabs. Stated differently, just because Defendant closed bank accounts of 25 Arab-Americans without providing justification for doing so and even with knowledge of Plaintiffs' race does not, without more, lead to an inference of race discrimination.  *16630 Southfield Ltd. P'ship*, 727 F.3d at 506; *Mekuria*, 883 F. Supp. 2d at 15-16; *Life for Relief & Dev.*, 2013 WL 3810255, at *2.

18

Plaintiffs unconvincingly attempt to fill this factual gap by pointing to the additional details provided in the three attached Affidavits.  First, they assert that the failure of non-Arabs to come forward with similar complaints evidences a discriminatory inference.  It is common sense, however, that a press release, press conference, and hotline sponsored by an Arab-American Civil Rights organization would only draw the attention of other Arabs -- much the same way similar complaint mechanisms set up by other advocacy groups would also likely attract complaints by those to whom the advocacy group caters and not by those outside of the purview of that advocacy group.[3]

Second, Dabaja's observations as a former employee do not sufficiently span the factual divide between possibility and plausibility.  Notably, Dabaja last worked for Defendant in September 2009 -- four years before the facts at issue in this case.  Though he attests that the "closing lists" contained the names of Arab

---

[3] Plaintiffs' Response suggests that this Court apply the "doctrine of chances" evidentiary theory, which, according to Plaintiffs "dispels the idea that serial unusual events can be dismissed as coincidence . . . and raises suspicion calling for further investigation."  (Plfs' Resp., Dkt. # 17, at 17-18).  As Judge Lawson of this District has noted, Michigan State Courts use this doctrine "as a means of validating the introduction of evidence under Michigan Rule of Evidence 404(b)." *State Farm Fire & Cas. Co. v. Allied & Assocs.*, 860 F. Supp. 2d 432, 441 (E.D. Mich. 2012) (Lawson, J).  Plaintiffs did not cite to any cases applying this doctrine to Federal Rule of Civil Procedure 8(a)'s pleading requirements and this Court declines to supplant *Twombly/Iqbal*'s plausibility standard with one born out of the law of evidence.  *Id.* at 442 (noting that the doctrine of chances does not excuse a plaintiff from meeting the pleading requirements set forth in the Federal Rules of Civil Procedure).

and Chaldean businesses resulting in the closure of over 200 accounts from 2008 through 2009, Dabaja presented no facts indicating that Defendant did so *on account of race and did so four years later when it closed Plaintiffs' accounts*. And, as indicated above, Dabaja's attestation that similarly situated "non-Middle Eastern bank account holders" did not suffer from similar closures is merely a label and conclusion under *Twombly* that just "will not do." *Twombly*, 550 U.S. at 555.

Third and finally, this Court declines to infer race discrimination from the fact that Defendant has not explained why it closed Plaintiffs' accounts, especially given Plaintiffs' claim that it did not make business sense to do so.[4]  Though the Sixth Circuit has made clear that "the existence of obvious alternative explanations simply illustrates the unreasonableness of the inference sought and the implausibility of the claims made," *16630 Southfield Ltd. P'ship*, 727 F.3d at 505, it has also rejected the notion that a Defendant must "come forward with an 'obvious alternative explanation.'" *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 613 (6th Cir. 2012) ("Regardless of whether [Defendant] has come forward with an 'obvious alternative explanation,' [plaintiffs] have failed to state facts that

---

[4] Plaintiff cites to an unpublished Western District of Tennessee case from 1980 for the proposition that because Defendant did not offer an explanation for the account closures, it did not rebut an inference of discrimination. (Plfs' Resp., Dkt. # 17, at 20-21) (citing *Jefferys v. R.W. Harmon & Sons*, 1980 U.S. Dist. LEXIS 12164 (W.D. Tenn. Feb. 14, 1980)).  *Jefferys* is inapposite as it addresses applicable burdens under the *McDonnell Douglas* test in the context of a Rule 56 motion.  As discussed in footnote 2, the *McDonnell Douglas* burden-shifting approach simply does not apply at this procedural juncture.

20

plausibly support a claim of discrimination.") (citation omitted).  Requiring a defendant to affirmatively produce an "alternative explanation" where, as here, a complaint merely pleads facts consistent with liability would improperly shift Rule 8(a)'s pleading burden away from a plaintiff's obligation to set forth facts sufficient to "nudge[] . . . claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *16630 Southfield Ltd. P'ship*, 727 F.3d at 503 (Rule 8(a) "imposes legal *and* factual demands on the authors of complaints").

## C.    Plaintiffs May File a Second Amended Complaint

As noted, Plaintiffs' Amended Complaint fails to meet the pleading standards established by the Supreme Court.  It is this Court's general practice to provide a plaintiff with an opportunity to amend a complaint when faced with a dismissal that is readily curable because slight defects should not condemn an otherwise viable complaint.  Plaintiffs attempted to cure their defects with both the Amended Complaint and the three attached affidavits in response to Defendant's Motion to Dismiss.  As set forth above, the additional facts contained within those documents do not satisfy *Twombly/Iqbal's* plausibility standard -- a standard that simply does not permit this Court to breathe life into claims that are wholly supported by conclusory allegations and formulaic recitations of the elements. Nonetheless and out of an abundance of caution, the Court dismisses Plaintiffs'

Amended Complaint without prejudice and will permit Plaintiffs to file a Second Amended Complaint.

## IV. CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant's Motion to Dismiss Plaintiffs' First Amended Class Action Complaint Under Rule 12(b)(6) [Dkt. # 14] is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Amended Complaint is dismissed without prejudice.

IT IS FURTHER ORDERED that Plaintiffs may filed a Second Amended Complaint by no later than twenty-one days after entry of this order; otherwise, this Court will enter a judgment of dismissal with prejudice.

**IT IS SO ORDERED.**

Dated:        March 13, 2014        s/Gerald E. Rosen
                                    GERALD E. ROSEN
                                    CHIEF, U.S. DISTRICT COURT

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, March 13, 2014, by electronic and/or ordinary mail.

                                    s/Julie Owens
                                    Case Manager, 313-234-5135

22